PAUL J. FISHMAN
United States Attorney
LEAH A. BYNON
Assistant U.S. Attorney
970 Broad Street, Room 700
Newark, NJ  07102
Tel. 973-645-2736
Fax. 973-645-3210
email: LEAH.BYNON@usdoj.gov
LAB0321
(FLU:YH)



### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Hon. WILLIAM J. MARTINI** |
| *Plaintiff,* | **CRIMINAL No.  06-038-01** |
| v. | |
| **CHRISTIAN NIGRO,** | **APPLICATION AND ORDER FOR WRIT OF GARNISHMENT** |
| *Defendant,* | |
| and | |
| **GUNN ALLEN FINANCIAL, and its successors or assigns,** | |
| *Garnishee.* | |

The United States of America, plaintiff, makes this application in accordance with 28 U.S.C. § 3205(b)(1) to the Clerk of the United States District Court to issue a Writ of Garnishment upon the judgment entered against the defendant, Christian Nigro, social security number *******7715, whose last known address is Brooklyn, NY  in the above cited action in the amount of $509,382.00, plus interest at the rate of 4.98% per annum and penalties.

The total balance due and owing as of December 28, 2009 is $555,932.84.

Demand for payment of the above-stated debt was made upon the debtor not less than 30 days from December 28, 2009, and debtor has failed to satisfy the debt.

The Garnishee is believed to have possession of property in which Christian Nigro has a substantial non-exempt interest.  More specifically, the Garnishee is a financial institution which is believed to have in its custody, control, or possession, property belonging to the judgment debtor, Christian Nigro.

The name and address of the Garnishee or his authorized agent is:

>Gunn Allen Financial
>5002 West Waters Avenue
>Tampa, FL 33634

Based upon the foregoing, the United States respectfully requests the Court to enter an Order directing the Clerk of the United States District Court to issue a Writ of Garnishment.

PAUL J. FISHMAN
United States Attorney

By:      LEAH A. BYNON
Assistant U.S. Attorney

IT IS, on this _____ day of _____, 2009,

**ORDERED**, that the Clerk of the Court shall issue the Writ of Garnishment.

HON. WILLIAM J. MARTINI, JUDGE
UNITED STATES DISTRICT COURT

PAUL J. FISHMAN
United States Attorney
LEAH A. BYNON
Assistant U.S. Attorney
970 Broad Street, Room 700
Newark, NJ  07102
Tel. 973-645-2736
Fax. 973-645-3210
email: LEAH.BYNON@usdoj.gov
LAB0321
(FLU:YH)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Hon. WILLIAM J. MARTINI** |
| *Plaintiff,* | **CRIMINAL No. 06-038-01** |
| v. | |
| **CHRISTIAN NIGRO,** | **CLERK'S NOTICE OF POST-JUDGMENT GARNISHMENT** |
| *Defendant,* | |
| and | |
| **GUNN ALLEN FINANCIAL, and its successors or assigns,** | |
| *Garnishee.* | |

## TO THE ABOVE-NAMED DEFENDANT AND ALL OTHER PERSONS INTERESTED:

You are hereby notified that property in the possession, custody, or control of Gunn Allen Financial, in which you have an interest, is being taken by the United States of America which has a Court judgment in CRIMINAL No. 06-038-01 in the sum of $509,382.00.  A balance of $555,932.84 remains outstanding.

In addition, you are hereby notified that there are exemptions under the law which may protect some of the property from being taken by the Government if Christian Nigro can show that the exemptions apply.  Attached is a summary of the exemptions which are applicable.

If you are Christian Nigro you have a right to ask the court to return your property to you if you think you do not owe the money to the Government that it says you do, or if you think the property the Government is taking qualifies under one of the above exemptions.

The instructions for objection to the Answer of the Garnishee and for obtaining a hearing on the objections are set forth in the "Notice of Garnishment and Instructions to the

Above-named Defendant" served upon you by the United States of America.

If you want a hearing, you must notify the court within 20 days after receipt of the notice. Your request must be in writing.

If you wish, you may use this notice to request the hearing by completing the Request for Hearing Form which is attached to the Writ of Garnishment. You must either mail it or deliver it in person to the Clerk of the United States District Court at the King Federal Courthouse, 50 Walnut Street, Newark, N.J. 07102. You must also send a copy of your request to the United States Attorney, Financial Litigation Unit at 970 Broad Street, 7th Floor, Newark, NJ 07102, so the Government will know you want a hearing.

The hearing will take place within 5 days after the Clerk receives your request, if you ask for it to take place that quickly, or as soon after that as possible.

At the hearing you may explain to the judge why you think you do not owe the money to the Government. If you do not request a hearing within 20 days of receiving this notice, a Court Order will be entered attaching the wages, monies, and/or commissions which will then be applied against the judgment owed the Government.

If you think you live outside the Federal judicial district in which the court is located, you may request, not later than 20 days after you receive this notice, that this proceeding to take your property be transferred by the court to the Federal judicial district in which you reside. You must make your request in writing, and either mail it or deliver it in person to the Clerk of the District Court at the King Federal Courthouse, 50 Walnut Street, Newark, N.J. 07102. You must also send a copy of your request to the United States Attorney, Financial Litigation Unit at 970 Broad Street, 7th Floor, Newark, NJ 07102, so the Government will know you want the proceeding to be transferred.

Be sure to keep a copy of this notice for your own records. If you have any questions about your rights or about this procedure, you should contact a lawyer, an office of public legal assistance, or the clerk of the court. The clerk is not permitted to give legal advice, but can refer you to other sources of information.

WILLIAM T. WALSH
CLERK, U.S. DISTRICT COURT

By: _____
Deputy Clerk

PAUL J. FISHMAN
United States Attorney
LEAH A. BYNON
Assistant U.S. Attorney
970 Broad Street, Room 700
Newark, NJ 07102
Tel. 973-645-2736
Fax. 973-645-3210
email: LEAH.BYNON@usdoj.gov
LAB0321
(FLU:YH)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | | **Hon. WILLIAM J. MARTINI** |
| | *Plaintiff,* | **CRIMINAL No. 06-038-01** |
| v. | | **WRIT OF GARNISHMENT** |
| **CHRISTIAN NIGRO,** | | |
| | *Defendant,* | |
| and | | |
| **GUNN ALLEN FINANCIAL,** **and its successors or assigns,** | | |
| | *Garnishee.* | |

GREETINGS TO:    Gunn Allen Financial
5002 West Waters Avenue
Tampa, FL 33634

An Order Granting Application of the United States for a Writ of Garnishment against

the property of Christian Nigro,  defendant, has been filed with this Court.  A judgment has

been entered against the above-named defendant in the amount of $509,382.00, plus interest

and penalties, computed through December 28, 2009.

You are required to begin withholding in accordance with this garnishment from the

date you were served with these papers.

You are required by law to answer in writing, under oath, within ten (10) days, whether or not you have in your custody, control or possession, any property in which has a substantial non-exempt interest. You must state the amounts you anticipate owing Christian Nigro in the future.

You must file the original written answer to this writ within ten (10) days of your receipt of this writ with the United States District Clerk at: King Federal Courthouse, 50 Walnut Street, Newark, N.J. 07102. Additionally, you are required by law to serve a copy of this writ upon the debtor and upon the United States Attorney, Financial Litigation Unit, 970 Broad Street, 7th Floor, Newark, NJ 07102.

Under the law, there is property which is exempt from this Writ of Garnishment. Property which is exempt and which is not subject to this order is listed on the attached Claim for Exemption form.

If you fail to answer this writ or withhold property in accordance with this writ, the United States of America may petition the Court for an order requiring you to appear before the Court. If you fail to appear or do appear and fail to show good cause why you failed to comply with this writ, the Court may enter a judgment against you for the value of the debtor's non-exempt property. It is unlawful to pay or deliver to the defendant any item attached by this writ.

DATED: 1-12-10

WILLIAM T. WALSH
UNITED STATES DISTRICT COURT CLERK

By:

DEPUTY CLERK

**BarCode Print Date:**
**09/02/08 11:20:50**

JNELSON





**U. S. Department of Justice**

Federal Bureau of Prisons

*Federal Correctional Complex*

---

*Federal Medical Center*
*P. O. Box 1600*
*Butner, NC 27509*
*(919) 575-3900*

December 30, 2009

Clerk of Court
Martin Luther King, Jr. Federal Building
and United States Courthouse
50 Walnut Street
Newark, New Jersey 07101

**RECEIVED**

**JAN 1 1 2010**

AT 8:30_____M
WILLIAM T. WALSH, CLERK

RE:   GRAY, Antoine
      Register Number:   28669-050
      Docket Number:     Cr.No. 07-359(KSH)

Dear Clerk of Court:

Please find enclosed a Certificate of Restoration of Competency to Stand Trial on the above referenced individual.

Mr. Gray was committed to our facility under the provisions of Section 4241(d), for continued hospitalization and treatment in an effort to restore his competency to stand trial.  Mr. Gray is now competent to stand trial and our report reflecting this opinion will be forwarded to the Honorable Katharine S. Hayden, United States District Judge for the District of New Jersey, on this date.

This Certificate is being filed with your office pursuant to Title 18, United States Code, Section 4241(e).  Thank you for your assistance in this matter.

Respectfully,

Raul Campos, Acting Warden
FCC Butner

Enclosures

cc:   The Honorable Katharine S. Hayden
      Scott B. McBride, Assistant United States Attorney
      Donald J. McCauley, Defense Attorney

**CERTIFICATE OF RESTORATION OF COMPETENCY
TO STAND TRIAL**

This is to certify that Antoine Gray, Register Number 28669-050, is
able to understand the nature and consequences of the proceedings
against him and to assist properly in his own defense.   This
certification is made and filed with the Clerk of the Court pursuant
to Title 18, United States Code, Section 4241(e).

In accordance with Section 4241(e), the Clerk of the Court should mail
a copy of this certificate to the defendant's counsel and to the
attorney for the Government.

_____
Raul Campos, Acting Warden
FCC Butner


Subscribed and sworn before me this _30th_ day of _December_, 2009.

_____
Notary Public

My Commission Expires _April 18, 2012_

```
Donna S. McRae
Notary Public
Granville County, NC
My Commission Expires April 18, 2012
```



**U. S. Department of Justice**

Federal Bureau of Prisons

*Federal Correctional Complex*

---

*Federal Medical Center*
*P. O. Box 1600*
*Butner, NC 27509*
*(919) 575-3900*

December 30, 2009

The Honorable Katharine S. Hayden
Martin Luther King, Jr. Federal Building
and United States Courthouse
50 Walnut Street
Newark, New Jersey 07101

RE:   GRAY, Antoine
       Register Number:   28669-050
       Docket Number:     Cr.No. 07-359(KSH)

Dear Judge Hayden:

In accordance with your Court Order of June 10, 2009, a psychiatric
evaluation of Mr. Gray has been completed.

Mr. Gray was admitted to our facility under Section 4241(d).  It is
the examiners' opinion that Mr. Gray is now competent to stand trial.
He is not suffering from a mental disease or defect to the extent that
he is unable to understand the nature and consequences of the
proceedings filed against him or assist properly in his own defense.
It should be noted his competency is contingent on strict medication
compliance.   I have enclosed the report prepared by our staff
reflecting these opinions.

If you require additional information or clarification of issues
presented in the attached report, our clinicians are available by
phone or video conferencing.  Unfortunately, our budget does not
include funding for travel, therefore, if a clinician's presence in
Court is required, we will have to request reimbursement of expenses.

The United States Marshals Service have not been notified at this time
for return of Mr. Gray to your District Court due to his need for
medications that are currently being administered involuntarily.
Involuntary administration of psychotropic medications ordinarily take
place at Federal medical centers.

If we can be of further assistance to the Court in this or other
matters, please do not hesitate to contact our Chief Psychiatrist,
Dr. Jean Zula at extension 5475.

Respectfully,

Raul Campos, Acting Warden
FCC Butner

cc:   Scott B. McBride, Assistant United States Attorney
       Donald J. McCauley, Defense Attorney

**FORENSIC EVALUATION**
**Mental Health Department**
**Federal Medical Center**
**Butner, North Carolina**

**NAME:**              GRAY, Antoine
**REGISTER NUMBER:**   28669-050
**DOCKET NUMBER:**     Cr.No. 07-359(KSH)
**DATE OF BIRTH:**     11/01/74
**DATE OF REPORT:**    12/14/09
**DATE SIGNED:**       01/06/10

**IDENTIFYING INFORMATION:**  Mr. Gray is a 35-year old African
American male from Newark, New Jersey.  He was admitted to the
Federal Medical Center (FMC) Butner, North Carolina, on 07/24/09
to undergo an evaluation pursuant to Title 18, U.S. Code, Section
4241(d).  In a Court Order dated 06/10/09, the Honorable
Katherine S. Hayden, United States District Judge for the
District of New Jersey, committed Mr. Gray to the custody of the
Attorney General of the United States for further psychiatric
treatmentafter finding him incompetent to stand trial.

Mr. Gray is charged with Knowingly Possessing in and Affecting
Commerce Ammunition and Felon in Possession of a Firearm that
occurred on or about 12/27/06.  Donald J. McCauley is
representing Mr. Gray, and Scott B. McBride is the Assistant
United States Attorney (AUSA) assigned to the case.

The following collateral information was reviewed in the
preparation of this report: Judge Hayden's court order dated
06/10/09; Indictment filed on 04/27/07; Pretrial Services Report
dated 05/09/07; letter written by Scott McBride, AUSA, to Donald
McCauley, Assistant Federal Public Defender, dated 05/21/07;
Newark, NJ Police Department Incident Report dated 12/27/06;
State of New Jersey Judgment of Conviction and Order for
Commitment dated 09/29/95; document entitled Event Chronology,
dated 02/08/07; New Jersey Criminal History Detailed Record;
records from Essex County Correctional Facility, dated 2006,
2007, and 2008; Competency to Stand Trial Evaluation and Criminal
Responsibility Evaluation reports prepared by William J. Ryan,
Ph.D., at the Metropolitan Correctional Center in New York, NY,
dated 03/17/09; and Bureau of Prisons Psychology Data System
(PDS) records.

**DATES OF CONTACT/PROCEDURES ADMINISTERED:**  During this evaluation
Jill R. Grant, Psy.D., Staff Psychologist, conducted individual
interviews with Mr. Gray.  Psychiatric consultation was provided

Page 1 of  11

by Bruce Berger, M.D., Staff Psychiatrist and Joseph Williams, M.D., Psychiatry Forensic Fellow, under the supervision of Dr. Berger. Medical, Correctional, and other Mental Health staff had an opportunity to observe his behavior throughout his stay at our institution, and their observations and comments were considered in the preparation of this report. Mr. Gray also underwent a routine physical examination and laboratory studies. The following procedures were administered during this evaluation:

```
Clinical Interviews     (ongoing)
Behavioral Observation (ongoing)
Physical Examination    (08/06/09)
CT Scan of Brain Without Contrast (08/26/09)
Involuntary Medication Administrative Hearing (09/17/09)
Shipley Institute of Living Scale (11/18/09)
Personality Assessment Inventory (11/18/09)
```

**BACKGROUND INFORMATION**: At the outset of the study period, Mr. Gray was informed any information and results obtained during the evaluation would be shared with the Court and the attorneys involved in this case. He appeared to have an adequate understanding of the limits of confidentiality. Background information is presented in the MCC New York Competency to Stand Trial and Criminal Responsibility Evaluations filed with the Court. This evaluation provides a summary of that information and focuses primarily on Mr. Gray's institutional adjustment during the current evaluation, clinical diagnoses and prognosis, and the evaluators' opinion regarding his competency to stand trial.

According to collateral information, Mr. Gray was raised primarily by maternal aunts after his mother abandoned him when he was 3-years old. He reported his mother and a maternal uncle were diagnosed with Schizophrenia and Bipolar Disorder. He also reported mental illness among other family members. He reportedly has had no contact with his father who is now deceased. He previously reported being physically abused by one aunt and being sexually abused at camp when he was 12-years old.

Mr. Gray reportedly had learning and attention problems in school and was enrolled in special education classes as a result. He dropped out at age 15. His work history is sporadic; he reported working in several labor-type jobs and quitting after becoming frustrated. He has provided inconsistent information to evaluators regarding his relationship history.

According to collateral information, Mr. Gray started using marijuana and alcohol at age 11 and has used both fairly consistently throughout his life. He also reported using ecstasy daily from 2003 to 2005. In addition, he previously reported using PCP once and using mescaline approximately 12 times.

Mr. Gray has an extensive psychiatric history. As a child, he was reportedly diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and was prescribed Ritalin. He also reportedly ate two ammonia inhalers and was hospitalized at a child treatment center. At age 19, he attempted suicide by cutting his wrist and then by attempted hanging, and was subsequently admitted to Ann Klein Forensic Center. In May 2003, he was seen in a hospital emergency room due to suicidal ideation but was released on the same day. Mr. Gray was hospitalized for inpatient treatment at The University Hospital in New Jersey for approximately ten days in May 2004. At that time, he was reportedly paranoid and believed ten men were after him and his family. He thought he would be killed and was having sleeping problems; was not eating; and was refusing his psychotropic medications. He also claimed to have a lot of money, thought others were jealous of him, and said he needed a gun to protect himself and his family. He apparently responded well to treatment with Zyprexa and Haldol. In December 2004, he was again admitted to University Hospital after drinking roach poison in a possible suicide attempt. He later stated he had wanted to kill himself rather than be killed by his pursuers.

According to the previous competency evaluation, Mr. Gray was incarcerated at Essex County Correctional Facility from December 2006 through March 2008 and had no adjustment problems. In March 2008, he began exhibiting manic symptoms and set fire to his cell, injuring officers in the process He was referred for a psychiatric consultation. During his interview with the psychiatrist, Mr. Gray reportedly exhibited pressured speech and grandiose and persecutory delusions. He was placed on special observation status as a result. He initially refused to cooperate with mental health staff or take prescribed medication but later cooperated with an interview in May 2008 to determine if he could return to general population. During that interview, he reportedly exhibited pressured speech, restlessness, disorganized and tangential thinking, symptoms of depression, constricted affect, and paranoid thinking. He continued to present as paranoid with staff and in June 2008 requested to see medical staff due to shortness of breath and chest pain. He reportedly had a very labile mood at that time and disorganized thoughts that were somatically focused. A mental health worker noted that he was not exhibiting behavioral problems but

continued to present as paranoid and delusional.  He made statements about the dentist putting "chips in Italians' gums that control their anatomy."  He eventually agreed to take medication to go back to the general population but was inconsistent in his compliance and remained unstable.  The treatment providers diagnosed him with Bipolar Disorder, Depression, Anxiety, and Psychosis.

At MCC New York, Mr. Gray underwent an evaluation of his competency to stand trial and criminal responsibility at the time of the current alleged offense.  According to the evaluator's report, he was housed in both the general population and the secure area of the institution and caused no management problems.  He reportedly told the consulting psychiatrist during an interview that people were chasing him and trying to get his "biogenetic organs."  He reported hearing things from the computer and satellite and stated there were members of his "diplomatic corps listening" because he had "biogenetic organs."  The psychiatrist diagnosed him with Schizophrenia with a notation to Rule out Schizoaffective Disorder.  Mr. Gray was prescribed Haldol and Cogentin.  He was described as cooperative and showed no signs of psychomotor excitation or retardation.  He reported having sleep difficulties and nightmares related to childhood sexual abuse.  He reportedly exhibited disorganized thinking when discussing his delusions.  He discussed, at length, his paranoid delusion regarding "biodegradable materials" implanted into his gums by a dentist that caused him to be "biogenetic."  He believed he was immortal as a result of the implantations and thought people were trying to steal his DNA and "biogenetic" organs.  He also reported having visions about future events.  At the conclusion of that evaluation, Mr. Gray was diagnosed with Schizophrenia, Paranoid Type; Posttraumatic Stress Disorder; Polysubstance Dependence; Borderline Intellectual Functioning (although intellectual test results revealed a wide range of scores); and Head Injury.  The evaluator opined he was not competent to stand trial and was insane at the time of the alleged offense.

In terms of his criminal history, Mr. Gray has multiple drug-related charges, some of which were dismissed, and some for which he was convicted.  He also was convicted of, and served an active prison sentence for, aggravated assault, assault on a police officer, resisting arrest, and unlawful possession of a weapon.  He was charged with robbery, aggravated assault, terroristic threats, and tampering with a witness, but all charges were dismissed.  According to collateral information, the current alleged offense involves Mr. Gray brandishing a firearm outside of a grocery store, yelling "what, what?" when the police pulled

up.  He ran from the officers as they exited their vehicle and
began walking towards him.  When they caught up with him and told
him to show his hands, he tossed the firearm and attempted to
climb a fence but fell and hit his head on the concrete.  He
struggled briefly while being handcuffed but was eventually
controlled successfully without further incident.

**COURSE IN INSTITUTION:**  After his admission to FMC Butner,
Mr. Gray was medically evaluated.  His past medical history was
negative for any acute or chronic physical disease or known
allergies.  A physical examination was performed on 08/06/09 and
revealed an adult male in no acute physical distress with the
following vital signs: temperature of 98.4 degrees Fahrenheit,
pulse of 91 beats per minute, blood pressure of 137/70 mm of Hg,
height of 72 inches and weight of 225 pounds.  The remainder of
the physical examination revealed no acute physical abnormalities
and the clinical impression was that of an essentially physically
healthy adult male.  Screening for tuberculosis on 08/06/09
revealed a positive reading of 17 mm of skin induration.  A
follow-up chest X-ray on 08/11/09 revealed no active disease or
abnormality.  Laboratory studies revealed normal or clinically
insignificant blood chemistries, with the exception of a random
non-fasting blood glucose of 149.  Screening for syphilis was
negative.

Because Mr. Gray had reported a history of a head injury, a
computed tomography (CT) scan was ordered on 08/25/09, which
showed no abnormalities per report of the radiologist.  During
his hospitalization, Mr. Gray was not prescribed any medications
for medical purposes.

With regard to Mr. Gray's psychotropic medication management
while at FMC Butner, Mr. Gray was continued on the medications he
was taking at the time of his hospital admission.  This regimen
consisted of the following oral medications: the antipsychotic
medication haloperidol 10 mg at bedtime, the mood-stabilizing
medication valproic acid 500 mg twice a day, and benztropine 1 mg
at bedtime as needed for potential side effects from haloperidol.
He was initially compliant with these medications and reported
tolerating them well. Mr. Gray entered into an agreement with his
psychiatrist by signing an informed consent to take these
medications as prescribed.  His course of treatment will be
further addressed below.

Upon his arrival, Mr. Gray was screened by the primary evaluator
in the receiving and discharge area of the institution.  At that
time, he was calm and cooperative but exhibited delusional
thinking as noted in his comments regarding his "biogenetic

organs" and the belief that others were trying to steal them.   He
denied previous or current auditory or visual hallucinations.   He
also denied suicidal or homicidal ideation.   He presented with
flat affect and said he had a history of "depression" but had
never experienced psychotic symptoms.   Generally, his insight
into his mental illness was poor.   However, he arrived with
prescriptions for psychotropic medications and stated he would
continue taking them.

Based on his initial presentation, Mr. Gray was housed on an open
mental health unit.   He was interviewed by psychiatry staff who
renewed his psychotropic medications (as previously noted).
However, beginning in September 2009 the nursing staff noted he
was not consistently taking his medications ("cheeking" the
medications and then spitting them out when out of sight of the
nursing staff).   When confronted by his clinicians he denied
"cheeking" his medications; however, staff continued to report
problems with medication non-compliance. He behaviorally adjusted
well initially, but then began exhibiting adjustment problems.
For example, the primary evaluator received a call from a nurse
on a housing unit to which he was not assigned.   She reported he
was in the ice machine room on the unit and appeared to be
masturbating.   When staff confronted him, he denied the
accusation but went back to the unassigned housing unit after
custody staff specifically told him to remain on his assigned
unit.   When custody staff approached him to escort him to the
secure housing unit because he was out of bounds and had received
an incident report, he became agitated and appeared suspicious
and paranoid.   As his property was being packed to store while he
was in the secure housing unit, the officer found several Haldol
pills.   This supported the nursing staff's observationsa that he
had spit them into a cup instead of taking them as prescribed.
When the treatment team staff approached him about cheeking his
medication, he admitted he did not take a few of his pills
because he did not like the dosage time, stating it upset his
stomach.   He requested to take his medication at a different time
of day.   After the dosage times were changed, he was observed
taking his oral medications regularly while housed in the secure
housing unit.   Because he appeared less agitated, exhibited no
management problems, and was medication compliant for
approximately two weeks, he was released back to the open housing
unit.   He remained on the open unit for only a few days before
having problems again.   Specifically, he got into a fight with
his cellmate but the details were unclear because the incident
was not witnessed by staff.   His cellmate suffered multiple
facial injuries (two black eyes, chin laceration), and Mr. Gray
had no obvious injuries.   The cellmate reported Mr. Gray started
beating on him during the night and that prior to that, he had

been pacing and talking to himself.  Mr. Gray reported that they had a verbal altercation first and his cellmate started the fight.  His cellmate's version of the fight was considered more plausible since Mr. Gray received no injuries and his cellmate was a former boxer.  Mr. Gray was found guilty of fighting and received disciplinary segregation time.

While housed in the secure housing unit after the fight with his cellmate, Mr. Gray gradually became noncompliant with prescribed psychotropic medication and often openly masturbated in front of female nursing staff.  He began exhibiting pressured speech, psychomotor excitation, and expansive mood.  When the primary evaluator attempted to interview him, he typically asked repeatedly, "what's poppin' with ya?" and could not be redirected.  When treatment team staff approached him about taking medication in the form of injection or liquid (to insure he was not cheeking it), he refused.  He said the judge did not order him to take medication and he did not have to take it as a result.  He also said he wanted his attorney to be notified that FMC Butner staff were trying to medicate him against his will.  Over time, his mental status deteriorated, secondary to medication noncompliance.

The treatment team believed that his aggressive behavior towards his cell-mate when unmedicated or undermedicated rose to the level of dangerousness towards others in the institution due to a mental illness, consistent with criteria set forth in <u>Harper</u>.  It was their opinion that he could benefit from the involuntary administration of antipsychotic and/or mood stabilizing medication to improve his mental status and behavioral control.  The involuntary medication hearing was conducted on 09/17/09, and it was the hearing officer's decision that he did meet criteria for dangerousness toward others in the institution due to a mental illness.  Mr. Gray appealed the decision, but the appeal was denied.

After the involuntary medication (Harper) hearing, the treatment team decided to discontinue the oral formulation of haloperidol and valproic acid and initiate treatment with the long-acting injectable antipsychotic medication haloperidol decanote.  Mr. Gray was quickly titrated up to a dosage of 100 mg by intramuscular (IM) injection every month.  In addition, Mr. Gray was given oral benztropine 1 mg twice daily for potential medication side effects.  Because Mr. Gray continued to experience psychotic symptoms, his haloperidol decanoate dosage was further increased to 150 mg IM every month; he received this increased dosage beginning on 11/20/09.  Mr. Gray's psychotic symptoms improved while taking this dosage of haloperidol

decanoate.  On 12/10/09 it was noted that Mr. Gray was experiencing side effects from his antipsychotic medication (specifically, a tremor).  As a result, the dosage of his benztropine was increased to 2 mg orally twice daily, which helped reduce his side effects.  He remained housed on the restrictive housing unit for approximately one month, during which he participated in staff escorted passes to the open housing unit and recreational areas and was seen daily during routine clinical rounds.  Over that period of time, he became more behaviorally calm, and his speech and affect improved.  He also began interacting more appropriately with his treatment team.

Mr. Gray has now been housed on an open mental health unit for approximately six weeks.  During that time, he has posed no management problems and has been compliant with prescribed treatment.  He has been re-enrolled in the weekly competency restoration group.

**PSYCHOLOGICAL TESTING**
Previous Test Results: During the previous competency evaluation at MCC New York, Mr. Gray underwent intellectual and personality testing.  Select verbal subtests of the Wechsler Intelligence Scale, Fourth Edition (WAIS-IV) were administered.  Results indicated a wide range of standard scores falling in the Low Average to Average range (9 on Similarities) to the Borderline Range (5 on Vocabulary and Comprehension).  Evaluators reported a score of 81 on the Verbal Comprehension Index (which falls in the Low Average range) and suggested the results on select subtests suggested he "probably functions in the Low Average Range." However, the evaluators inconsistently indicated that test results suggested "a diagnosis of Borderline Intellectual Functioning."  Mr. Gray was noted to take an unusually long time to complete the Minnesota Multiphasic Personality Inventory, Second Edition (MMPI-2), a test of personality characteristics and psychological problems.  Validity Scale indices indicated response inconsistency.  As a result, the evaluators did not interpret the clinical scale results and noted that his understanding may have been impaired due to random responding, reading comprehension deficits, or thought disorganization related to psychosis.  The evaluators noted that Mr. Gray did not appear to be feigning memory deficits as indicated by the results of the Rey 15-Item Test on which he reproduced 15 out of 15 items.

Current Test Results: During the current evaluation, Mr. Gray was administered an intellectual screening and personality test after his mental status was stabilized with psychotropic medication.

Both tests were administered in a group testing clinic.  When
presenting for his scheduled testing appointment, Mr. Gray was
alert, oriented, and adequately groomed.  He had toilet tissue
placed in his nostrils, which he reported stopped his runny nose.
He was cooperative during testing.  His affect was restricted,
but there were no observable problems with his mood.  He appeared
to have no difficulty understanding and following instructions.
On a few occasions, he appeared distracted and was offered
assistance by the testing facilitator but declined.

Mr. Gray was administered the Shipley Institute of Living Scale,
Second Edition.  A Verbal and Performance subtest were
administered.  His Vocabulary standard score fell within the Low
range, and his Block Design standard score fell within the Below
Average range.  The Composite Score fell within the Low range.

Mr. Gray was administered the Personality Assessment Inventory
(PAI), an objective test of personality characteristics and
psychological problems.  This particular test was chosen because
the reading proficiency is lower than that required for the MMPI-
2.  Results suggest he did not attend appropriately to the items
possibly due to reading difficulties, careless or random
responding, confusion, or failure to follow instructions.  Due to
the invalidity of the results, no clinical interpretation can be
made.  When questioned about his responses,
Mr. Gray reported he had difficulty reading the items.  To assist
in the assessment of his competency to stand trial, Mr. Gray was
administered a 25-item competency questionnaire that pertains to
legal terminology and procedures and  roles of courtroom
personnel.  This questionnaire was administered by the primary
evaluator on an individual basis.  During the session, Mr. Gray
was cooperative, polite, and socially appropriate.  His affect
was full-range, and he responded to humor.  His attention and
concentration were adequate.  He answered all items correctly,
suggesting that he has an adequate factual understanding of the
legal system.  A discussion was also held about the alleged
offense and his ability to work with his attorney.  He reported
some disappointment in his attorney but said he could work with
him in preparing his defense when he returned to court.  He
reported he was not taking antipsychotic medication at the time
of the alleged offense and did not have a good memory of details;
however, he did have a correct memory of his charges and recalled
that he incurred a head injury.  His explanation of the injury
was discrepant from that provided in collateral information.  He
reported he wanted to be found competent and wanted to return to
court to resolve his charges.

**IMPRESSIONS**:  According to the *Diagnostic and Statistical Manual*

*of Mental Disorders, Fourth Edition, Text Revision,* (DSM-IV-TR),
by the American Psychiatric Association we currently view
Mr. Gray's diagnoses as follows:

Axis I:     Schizoaffective Disorder, Bipolar Type, 295.70
            (Principal Diagnosis)
            Cannabis Abuse by history, 305.20
            Alcohol Abuse by history, 305.00
            Other Substance Abuse by history (Ecstacy), 305.90
Axis II:    Rule-Out Antisocial Personality Traits
Axis III:   Positive PPD (17 mm of skin induration), with a normal
            chest X-ray 08/11/09
Axis IV:    Chronic mental illness, interaction with the legal
            system
Axis V:     GAF = 65-70 (current)

Mr. Gray's history and current symptoms most closely meet
criteria for a psychotic disorder.  Historically, he has been
most often diagnosed with Schizophrenia, Paranoid Type.  However,
treatment providers have considered a combined psychotic and mood
disorder diagnosis based on his symptom presentation.  At FMC
Butner, he has exhibited expansive mood, agitation, pressured
speech, irritability, and hypersexuality in addition to
delusional beliefs.  He has acted out aggressively during the
current evaluation, and it is believed his behavior was directly
linked to symptoms of his mental illness, including likely
paranoid thoughts, elevated mood state, and increased
impulsivity.  He has maintained a belief that he has biogenetic
organs and others want them, even when not presenting with mood
symptoms.  According to collateral information, this delusional
belief is longstanding.  His symptoms have responded well to
psychotropic medications.  Currently, his mental status and
behavior are stable.

In addition to a psychotic illness, Mr. Gray also has an
extensive substance abuse history linked with his treatment
noncompliance and criminal history.

Collateral information reveals a lengthy criminal history and
possible longstanding antisocial personality traits; however, a
definitive diagnosis of a personality disorder cannot be reached
at this time, given the predominance of his clinical
presentation.

Mr. Gray was previously diagnosed with Borderline Intellectual
Functioning at MCC New York; however, previous and current
intellectual test results do not support this diagnosis.  In
addition, Mr. Gray's interactions with staff indicate he is
functioning at a higher level.

Mr. Gray's prognosis is guarded.  On the one hand, he has
responded positively to psychotropic medication.  His mental
status is currently stable, and he exhibits no overt symptoms of
a mood or psychotic disorder.  He has a strong history of
noncompliance with prescribed treatment, however, and still
exhibits limited insight into his mental illness and need for
medication.  Complicating the clinical picture is his extensive
substance abuse history, which could have a negative impact on
his compliance with prescribed treatment.

Currently, it is our opinion that Mr. Gray's competency has been
restored with psychotropic medication.  He has an adequate
rational and factual understanding of the charges against him, is
able to assist his attorney in his defense, and has a good
factual knowledge of the legal system.  He is currently able to
maintain adequate focus during courtroom proceedings.  If any
delusional thoughts still exist, they are not prominant and do
not interfere with his ability to work with his attorney and
attend to proceedings.  Mr. Gray's current level of competency is
contingent upon taking psychotropic medication that manages his
mental illness by effectively treating his psychotic and mood
disorder symptoms.  Because the administration of involuntary
medication is limited to medical centers, we request that
Mr. Gray remain at this facility until his scheduled competency
hearing is imminent.

At the time of this report, Mr. Gray is prescribed the following
medications:  haloperidol decanoate
150 mg by intramuscular injection every 30 days, and benztropine
2 mg orally twice daily.

_____
Jill R. Grant, Psy.D.
Staff Psychologist
Mental Health Department
Federal Medical Center
Butner, North Carolina

_____ Supervised by: _____
Joseph Williams, M.D.                   Bruce Berger, M.D.
Forensic Psychiatry Fellow              Staff Psychiatrist

JRG:bb:jw/dsm